May it please the court and counsel. Your honors, Mr. Grigg maintains that reversible errors occurred both in the denial of his motion to suppress pre-trial as well as the trial itself. I'll begin by addressing the district court's erroneous what we feel is the erroneous denial of the motion to suppress unless the court prefers otherwise. Your honors, the police violated the Fourth Amendment when they stopped and detained Mr. Grigg on the basis of a past completed and discontinued noise violation, a city noise ordinance. Under the balancing test set forth in United States v. Hensley, the stop of Mr. Grigg was not justified. As a result, the evidence that flowed from that stop should be suppressed. Counsel, in Hensley the Supreme Court said that the fact that a crime was completed doesn't negate the ability of the police to make a stop. So how do you distinguish that from this situation? Your honor is correct. What I would say to that is in Hensley the court, the Supreme Court, through Justice O'Connor indicate articulated a bright line rule saying that police could stop if they had reasonable suspicion. They could do a Terry stop or completed felonies. The court could have argued or articulated a bright line rule that encompassed all offenses, but the court didn't do that. Instead, the court said we've got to engage in this balancing act. But what was the crime at issue in Hensley? It was a robbery, your honor. I believe it was a felony armed robbery and they the police had put out wanted flyers and some other police saw this gentleman that matched the description and pulled the person over on the basis of that. Had the robbery had again been used in the robbery? I'm sorry. Was there a gun involved in the robbery? I'd have to check, but I know for a fact it was a felony and I know I believe it was armed, but I can't say for sure. I'd have to refer to the case. But I think the court brings up an important point, and that's the difference in the nature of the violation that we're dealing with in Mr. Griggs case. If the court had wanted to, the court could have said once you've got reasonable suspicion that a person has completed a crime, whatever kind of crime, then you can pull them over. But the court stopped short. Of course, they could say whatever they want, but if they say something that is outside the scope of the facts of their case, it's just the dicta anyway, as some people would see it. So they might not have said any crime or misdemeanor because that issue wasn't presented in that case. That is correct. That would be fairly typical of at least how some of them write their opinions. So then that would mean we now have to take this case and figure out what makes sense in light of their opinion. That's absolutely correct. What I would say to that is Justice O'Connor indicated that we have to use, and the majority in Hensley said we have to use that balancing test. We balance the nature of the governmental intrusion, which, while it's not an arrest, a terrorist act is still a significant intrusion. And we balance that against the governmental interests that are being forwarded in the matter. And to do that, what I would say is, the police officer involved in this case expressly said, look, this was no emergency. It wasn't a big deal. The case had been discontinued. The homeowner who reported the complaint said that Mr. Grigg had turned the corner. He heard the noise for a couple of seconds, and then it got turned down. I would also say that the ---- Can I just make ---- I want to verify two things, and I'm pretty sure this is correct. Yes, sir. Just to be certain. The district court judge found that the crime was not ongoing. That's correct. That's off the table. That is not disputed, Your Honor. And second, that the citizen, Mr. Hamill, did not request that the officers make a citizen's arrest. That's correct. So the only thing going through the officers at that point was that they had ---- based on everything Mr. Hamill had told them, saw the car, that they had reasonable suspicion that a misdemeanor crime had occurred. Is that correct? That's correct, Your Honor. And had been completed before they arrived on the scene, about an hour before. What difference does it make, if any at all, in this matrix of factors that we need to consider, that under Idaho law, one cannot, an officer cannot arrest somebody for a misdemeanor unless they witness the crime? Well, I think that that ---- How does that fit into this thicket of facts? Well, I think the Court still has to determine overall whether under the Fourth Amendment this was reasonable. But I think the fact that legislature has spoken to the fact that police in Idaho can't pull someone over for this very type of thing speaks volumes to what the interests of the government in preventing this type of offense that has been completed are. I also would point out that Judge Windmill, the district judge, expressly found there was no public safety danger. Whereas in Hensley, you have an armed robber or a robber, forgive me if I don't remember. Armed. Yes. And running around, obviously the public safety danger there is extreme. There's also some indication that you could have misdemeanors that would be dangerous. If you've got an intoxicated driver, you would want them off the street. But a gentleman who blasted a stereo, arguably blasted it for a couple of seconds by the homeowner's own admission, who didn't do it as he's driving down the street. What seemed to be important to the district court was that the officers were investigating this, and they were talking with Mr. Hamill, and the guy drives by, and Hamill wants to sign the complaint. There he goes. Right. I'm going to sign the complaint against him. And so the officers say, well, you know, we're getting this information, and this guy drives by. Why, you know, it makes sense. Let's just complete this now. Go down, you know, there he is. Let's just stop him and talk to him and find out his side of the story. What's wrong with that? Related to that, I have the same question, Judge Pai. As I understand it, the officers didn't know the guy's name. They didn't know who the driver was. And so if they didn't stop him to complete it right then, they'd have to try to use other methods to figure out the... Well, to answer to both those questions, I think first what the court has to do is, it's my position that Judge Wendell put too much weight on the need to identify the perpetrator of this minor offense that was a noise violation with certainty, and to the exclusion, really, of all of the other factors articulated under Hensley. What I would say is, number one, Mr. Grigg had been given a previous verbal warning by the homeowner's own admission. That had been told to Officer McGuire, the responding officer. And Officer McGuire acknowledged that when that happens, Nampa police have to make a record of it. Now, he did say that it would have been unreliable to call it up on his in-car computer, but Officer McGuire said, I could have called dispatch. When asked how long would that take to find out if Mr. Grigg's name was in their computer, he said, it depends on how busy they are. And then he said, I wasn't going to bother with that because this was no big deal. The easiest thing would have been to just pull him over. My position, Your Honors, is that just because it's easy doesn't justify it under the Fourth Amendment. Because you're still dealing with an intrusion without a warrant, you're pulling someone over, that's still an intrusion on that individual's liberty. And I think it's – I'm sorry. I might be wrong on this, but I thought that Judge Windmill, in the suppression hearing phase of this, made a finding that the other method of trying to find out his name was unreliable. There is some confusion here, and I think it's important to look at the record. What was unreliable was Officer McGuire said that he could pull up that information directly in his computer in his police car. But he said, I'd never do that. It's unreliable. Then he said, what I would do is I would call dispatch and ask them to pull it up. And that's when the question – he didn't say that was unreliable. What he said was, that – we don't know how much time it would have taken because it depends how busy dispatch is. And to me, it wasn't that big a deal in the first place. So I don't think that Judge Windmill said that the dispatch would have been unreliable. I think the concern there was we didn't know how much time it would take. But there was never an effort made. If it's a general balancing test, then it seems like it sort of boils down to balancing the interest in law enforcement investigation about a completed misdemeanor versus the intrusion on Fourth Amendment values of a limited carry stop. I agree with that. But what I would just add is you had the police officer himself saying, we didn't have much of an interest in this, with all respect. It was a noise violation. It wasn't that big a deal. It wasn't an emergency. I wasn't going to bother to call dispatch. And I would note that when he arrived at the scene, Mr. Grigg was parked down the street. He was still available. And after Mr. Harmel started relaying this to him, Officer McGuire didn't make any effort to try to contact Mr. Grigg down the street. And that – there's no indication – I would just note the government has the burden of proving the validity of these stops. There's no indication that couldn't have been tried. I would also say that there was concern that Mr. Grigg might be driving away, but we had another officer who was there to follow him. And I have a question. Suppose Mr. Harmel got down to the police department and said, Mr. Grigg is driving by the neighborhood all the time, blasting his stereo at me and disturbing the neighborhood at all hours of the night, and I want a law to complain against him. He's driving a vehicle, a gray whatever it is, and I know his name is Mr. Grigg. And the cops do their little investigation at the station. They know that it's Mr. Grigg, and he drives X car and has a license plate. So they got their eye. Stop him. We want to serve the citation on you. Well, Judge Windmill himself said that he wouldn't find that that was reasonable under the Fourth Amendment because there – there is no need to identify the person. You have a place – you have an alternative rather than intruding on the person's liberty in that fashion. You could just drop the citation off at our home. The whole thing is – so the whole thing here is just Judge Windmill's determination that the need to investigate outweighs the citizen's right. In that – in this case. Right. And I'm not even articulating a break-line rule myself. What I'm saying is under these facts, with this minor an offense, it wasn't reasonable for them to sort of default to stopping the vehicle. Officer Roeder even testified he'd never asked to try to call the license plate in to dispatch to get a return to see who it was. There were other alternatives. It wasn't just a total absence of any means to identify Mr. Grigg. And I think if you take that measured against the other factors in the case, no exigent circumstances, no public safety danger, and an extremely minor offense, that the Fourth Amendment was violated as the stop was not reasonable. I would now turn to, with respect to what I think is a very serious issue of prosecutorial misconduct in this case. And when I say that, I mean no – no – and to no disrespect for my colleague, my friend, but I think that in this case, in the trial, he – he let himself get carried away. And I think that what we are facing is a perfect storm of prosecutorial misconduct in the trial. We had misconduct that, in my opinion, was continuous throughout the rebuttal argument. It was varied. We had vouching. We had severe inflammatory remarks. And we had unwarranted attacks, in my view, on defense counsel. And – and finally, all of these went unaddressed by the district court over several objections. In fact, I made four objections, one to the characterization that I was trying to say that the government and the agents were jackbooted Nazis. I objected, that's improper argument. Judge Wendell said, just back it off a bit. And the government then responded by saying again, for the second time, he wants you to hate the government. Well, they – they backed it off in the sense that on the second go-around of that argument, at least as I recall, the prosecutor left himself out of the equation. And he left out the jackbooted Nazis. He just said, they want you to hate the government and, you know, not believe the ATF guys. That's correct. And I – but I don't think that that's an appropriate thing to say. For first of all, under the invite-or-reply doctrine, you can't respond to improper tactics with improper tactics. But secondly, if the court reviews the record, I very clearly made a – a substantiated attack on the credibility of the eight testifying witnesses, which I'm entitled to do, whether they're ATF agents or people off the street. The government, I think, went way overboard in responding to that and basically put the – changed the whole tenor of the trial. It put the jury in the skies. Are we going to vote not guilty now? Because that guy is the guy who wants us to think he's a jackbooted Nazi, as well as the two other agents. And he wants us to hate the government. And that – that polarization just simply has no place in a federal criminal trial. I also would say that the – the prosecutor put himself on the same status and put his prestige alongside the ATF agents, not just in that instance by saying, I and he used the term we and vouched for the agent's testimony repeatedly by, number one, talking about – basically, he didn't just vouch for the agent's credibility. He vouched for his own position, his special role as a prosecutor. Let me explain – Is this where he – is this where he gets into the immunity? Yes, sir. That's correct. He says, let me explain to you what Monaghan didn't explain to you. These agents went to talk with Mr. Papa because I think it's – when these agents went to talk with Mr. Papa, because I think it's important for you to understand what use immunity is. It is a tool that we, as law enforcement officers, use to get the truth. This is doing two things that are prohibited. It's telling the jury information that's not before it. Mr. Grigg has a right to be tried on evidence that's presented at trial. Explain to me how the – the concept of use immunity even – What happened was the government – or the ATF agents went to speak to a defense witness named David Papa. And Papa was a critical witness for the defense because he had sold the rifle that issued Mr. Grigg. And he testified that Mr. Grigg – he narrowed the timeframe. Mr. Grigg only had the rifle for 30 days. When he sold it to Grigg, it was unassembled. Papa also said that the rifle might have been modified before he gave it to Grigg. And Papa also said that the rifle had been double-firing for him, which is technically a violation of the same statute that Mr. Grigg was charged under. When did the jury first hear the words use immunity? When Agent Rebbi testified, he said that we offered immunity to Mr. Papa through some leading questions. Meaning we, the government, offered use immunity to Mr. Papa. Correct. And it got a little muddy because when initially asked, well, was that use or transactional immunity, Agent Rebbi said, I don't really know the difference. So then Mr. Lukoff, if you look at the record, said, well, did you tell him that he would be – you know, he would not be prosecuted or that what he said wouldn't be used? And they said, well, we said that what he said wouldn't be used against him. But the real issue came when Mr. Papa said twice, look, I told you the truth. And then it was testified to by three witnesses, including one of the ATF agents, that as a parting shot, they said, well, if you don't take the immunity, someone's going to drink from that trough. Judge Windmill wasn't going to just let in the offer of immunity itself as probative of anything. It was that comment that Judge Windmill felt showed bias on the behalf of the investigating officers, and that's why he allowed the trough comment to come in. Agent Rebbi never testified about the things that the prosecutor – or I'm saying testified about, which I think he did. He never – he never said anything about the reasons why we give immunity. The only thing Agent Rebbi testified to in pages, I think, 573 to 579 of the excerpt of the record was simply that the reason we offered immunity to Papa was because we perceived some inconsistencies in his statement. The government took that and talked about the general purposes of why the government gives use immunity, and in doing so, vouched not only for the agents but vouched for himself and basically was saying, trust us. We wouldn't do anything inappropriate, and I think that that went well beyond what is – even if this court looks at – the government said I didn't make enough objections, but I think I made that objection. I certainly made a vouching objection, and I made four objections. At one point, one was sustained because the prosecutor said, they're not trying to hide anything from you. They're turning over reports. None of that was in evidence. So I said objection, and that one was sustained. But the others were basically overruled or nothing was done by the district court. Mr. Monahan, did you want to save some time for a couple? Yes, sir. Thank you very much, Your Honor. Thanks. Okay, Mr. Lusaw. Thank you, Your Honor. Yeah. If it pleases the Court, Aaron Lukoff, representing the United States of America, I'll begin by talking about the use immunity, which is what Mr. Monahan ended with. And I would point out that use immunity first made its appearance in this trial through Mr. Monahan's witness, through David Papa, and that's at Excerpt of Record 554. I objected to Mr. Monahan offering the fact that the agents had offered Papa use immunity, and the district court was not going to allow that evidence to come in. It wasn't until Mr. Monahan also mentioned that one of the agents had made this trough comment that Judge Windmill ruled that the evidence would come in. So use immunity first made its appearance in this trial through the defense. I'd also point out that the defense also is the first party that introduced my role in the decision to offer use immunity when it cross-examined Agent Kohler. Now, before Agent Kohler was examined in this case, David Papa, the witness who was offered immunity, and his mother, who was present at the time that the agents spoke with him, neither one testified that the agents had told him that the prosecutor had offered immunity. And then when Kohler took the stand, Agent Kohler took the stand, it was when Mr. Monahan asked him specifically, did you tell him that the prosecutor offered him immunity? And Kohler said, I believe so. And Mr. Monahan says, do you believe so? And Kohler says, yeah, I believe so. No, yes, that's why we were there. So use immunity made its first appearance through Mr. Monahan. Counsel, is it your argument that that then justified your use of the term we, as law enforcement officers, offer use immunity for a particular purpose? I think that my use of the word we was probably poor, and if I had to do over again, I would not use that. But in this situation, this is a case that's a little different from your standard prosecutorial vouching. If you read United States v. Hermannick, which I cite in my brief, that's a clear case where the prosecutor, where there's no evidence whatsoever in the record, the prosecutor was involved in the decision, in the investigative decision, and they're saying we and us and making themselves a part of the investigative team. Here, this is different, because the fact that I was involved in the decision to offer use immunity to David Popoff was placed in front of the jury by the defense. But you added quite a bit of additional detail to it when you addressed the jury. You're right. There's a... Well, I think there were some inferences that I made based on the testimony of Special Agent Reby. Information brought out in your remarks to the jury that was not known to the jury through the witnesses under oath. There were some inferences I drew. I'm not sure I was... I wouldn't say I was testifying. I think there were inferences that I made that I drew from what Special Agent Reby had testified to. He did testify that we had offered him use immunity and... He says on Excerpt Record 574, in other words, did you say, what you say today, Mr. Popoff, won't be used against you or did you offer him immunity from prosecution? And Reby says that what he said would not be used against him. And then he goes on further, I explained to him what the offer that you had told us to extend him and he did not accept the offer. So there was testimony about what use immunity was. Was there testimony that Mr. Popoff was lying? Because that's the term you used. Or in the record, is the word lying used in reference to Mr. Popoff's case? There is no evidence... The word lying was not used. There was evidence that when they interviewed Popoff that he told them one story and then they came back for the second interview and he told them a second story that was different, materially different from the first story. And that was through Special Agent Reby's testimony. I have a question about this. This whole issue, it's a little strange because at first blush it seems ancillary to the main issue which is the guy who's got the gun in his car did he know it was modified and is he guilty of the weapons offense? And then everything gets off on this sidetrack about whether use immunity was offered to Mr. Popoff and whether the agents offered it because they thought they had a weak case and then we get the vouching issue and we get Nazis and vouching introduced in response to that. So the whole trial kind of went off on a sidetrack on this issue it seems. I know you guys are probably in Boise, everybody goes fishing together you guys are probably buddies apart from this trial incident but this sort of went astray a little and what I wanted to know was where does it fit into the analysis if it's a side issue? If it's not the main issue in the trial does that affect our analysis of the vouching issue I don't know if ancillary is the right word definitely it's not the key issue of guilt or innocence and then second are we looking at this under a plain error standard and if so what's the significance of that? To answer your first question I think absolutely the fact that this whole use immunity issue was collateral to Mr. Griggs' guilt and I made that very clear in my rebuttal argument after I finished with the use immunity argument I told the jury that's not what this case is about the case is whether the government has proved its case beyond a reasonable doubt Bias is never collateral? Well bias wasn't but the fact that the agents were trying to hang this case on somebody as Mr. Monahan's argument went was. The trial was really about whether Griggs possessed a machine gun whether he knew it was a machine gun whether it was a defective semi-automatic weapon or a machine gun To answer your second question it's a plain error review and here's why at least on most of the objections Mr. Monahan did make one vouching objection towards the end of my argument but it is a plain error review with regard to my comment about the jackbooted Nazis Mr. Monahan's objection was not to the rhetoric of the comment and let me be very clear we're not arguing that the comment was justified or was proper we're arguing the district court handled it properly and it was an overstatement a bit of an overstatement and he sustained or actually he didn't even sustain the objection he went right to the point cut it off, said knock it off and the government complied and Mr. Monahan didn't object but if you look at his objection his first objection to that rhetoric it's on page 667 he says I certainly did not accuse Mr. Lukoff in any way his comment wasn't to his objection wasn't to the rhetoric but to the fact that I included myself in that rhetoric so he's raising a different issue today in all fairness he was not allowed to develop that argument he was cut off in mid-sentence when he made that objection so we don't know what response he was going to make well exactly and all we have is the record but he also had the opportunity after that if he was dissatisfied with the district court's response or the prosecutor's response he had the opportunity again to object to request a curative instruction to move for a mistrial and then also to file a motion for a new trial so there were a number of opportunities to bring this to the district court's attention and he never seized upon that and the Supreme Court has talked about that as far back as in 1940 as a rule defense counsel cannot remain silent interpose no objections and then after the verdict is returned cease for the first time on the point the prosecutor's comments were improper and prejudicial and that's the purpose of the plein air review and in this case the comments although we're not arguing that they were justified or proper don't rise to the level of infecting this trial or the verdict in this case counsel prosecutors in the United States attorney's offices they receive training on all of these proper techniques for closing argument and for examining witnesses and everything right? and so you're taught not to use I and we so why would that continuously happen if the training is to the contrary in this particular case the only thing I can say is that in this case I was brought in to the case, into the evidence both in Mr. Monahan's examination and then again in closing argument during his opening salvo and so in this particular case use of the word we and us had some foundation underpinnings in the evidence that's all I can say on that particular issue I did want to turn to the motion to suppress there was a comment about what Judge Windmill had found regarding the reliability of the of the system for checking out whether prior complaints had been made against prior verbal warnings had been given and I'll read to you Excerpt to Record 98 Judge Windmill states, however I think the testimony was clear that the system is unreliable referring to the system the officers could use to check to see if a verbal warning was issued and it was not at all certain that there would be any specific about the defendant or his vehicle or the circumstances what Judge Windmill's finding whether it was justified or not wasn't limited to just calling it up on the computer screen right, he was saying the whole thing would be unreliable the problem with this system and it's in the testimony of Officer McGuire is that the only way he had to check this out was to have his dispatch go to the address of the complainant in this case Jeffrey Harmel and run a search to see if any officers had been out there or not the only way he could have obtained the offender's name on that prior occasion was to it was either if Mr. Harmel had called it in and we know Mr. Harmel didn't know who Mr. Grigg was at this point in time or if the officer who had spoken to Mr. Grigg had asked dispatch to include his name in that report so there were at that point in time the officer had no way of knowing, he knew Harmel didn't know who Mr. Grigg was but he didn't know if the officer had included it in in the report, called in the dispatch and said specifically put in this gentleman's name, put in Mr. Grigg's name he didn't have that information and that's what I think he was getting at. So counsel, I mean the court found that the system that the police department has for cross-matching is unreliable? No I don't think he found specifically that that system was unreliable but it was, maybe a better word is uncertain He said yeah, and it's not at all certain that there would be any specific information about the defendant or his vehicle Right. That's what he said. And not unreliable Right, yeah, I think That would be a scary proposition I think what he's talking about is that not that the system is unreliable but whether the information would be there As I understand, the question I asked your defense counsel was it looks like what Judge Windmill focused on as the basis for the stop was the officer's desire to complete their investigation Well, and to learn the idea Judge Windmill is very clear, he found no ongoing violation and he found explicitly that Mr. Hamill did not want to make a citizen's arrest Correct They had not themselves witnessed any wrongful activity So the only thing it looks to me like is it zeroes in on investigation What is it about this crime why does this particular offense warrant stopping this car with the red light I don't believe that the court can focus on whether it's a felony or a misdemeanor I don't know what it is It makes a difference The problem in this case is that that isn't necessarily the nature of the offense Why was the investigation so important Jeffrey Harmel had reported to the officer that this had been an ongoing problem that on one occasion he had even confronted the person not Mr. Grigg but somebody else and that person had threatened him with a firearm and that he had called in before the police had told him you need to call us when it's actually happening so we can get out there They didn't know who this person was There's a law in the books that's been enacted by the city, I think this was a city code violation A law in the books that specifically talks to playing your stereo too loud and the citizens have an expectation that And the legislature has passed a law that says that Idaho police officers cannot make an arrest or a misdemeanor unless it occurs in their presence What weight does that get in this equation I don't think it gives any weight because one the officers weren't going to make an arrest of Mr. Grigg What they needed to know was who this person was and what they had was a little different than what the court had in Hensley What they had was a recently completed crime where the suspect was still on scene They didn't know who he was, they didn't have any real alternative methods that were readily available to them to learn who he was How about a little investigative work That doesn't work anymore? They could try it but there's no certain method There never is a certain method The most reasonable method was You're not going to walk down the street knocking on the door That may have worked Why? What's wrong with that? Because the Supreme Court has said that the task is reasonableness The Supreme Court hasn't said that if it's convenient when the crime is for blasting your stereo for a local ordinance noise violation you can stop somebody The Supreme Court hasn't said that No, but they have said you don't have to pick the most alternative method, just a reasonable method If we were to affirm this Why couldn't the police I mean, it seems to me this is carte blanche I don't know where you couldn't If we affirm this, and I'm only speaking from my own perspective not anybody else's, but it just strikes me that in this particular, the nature of the offense here a loud noise violation they ruled out any ongoing activity, the citizen didn't want to make an arrest I think it's convenience If you say, if we say that that is sufficient investigation is sufficient in this context I don't know where that's it, as far as I'm concerned I would respectfully disagree because I wouldn't disavow any other This is very This is so minor I just don't see how Even the police said Even the police said it was no big deal There were no safety concerns I have a question regarding the violation of the noise ordinance Doesn't it have to be a certain decibel level before it violates the noise ordinance and was that ever established, whether there was even a completed crime I don't believe that in this particular code there was a decibel requirement, it was a distance requirement So if you could hear it from, I believe it was 50 feet but don't hold me to that It was a distance requirement A very nebulous ordinance It isn't a felony offense like Hensley, but I don't think it opens the door for what I think this court's concern is How would you limit it? It is a recently completed crime where the suspect is still on scene, but is leaving the area The difference is that there's no danger, there's no accident circumstances there's no seriousness involved there's just a little old misdemeanor that the neighbor is upset with Not in this case, Your Honor Not in this case Justice O'Connor in her opinion in Hensley said that it was in the context of Hensley, but she says a brief stop and detention at the earliest opportunity after the suspicion arose is fully consistent with the principles of the Fourth Amendment What if a neighbor had complained that a dog was barking incessantly? Would that justify a stop if it were a misdemeanor to let your dog bark incessantly? It would depend on the facts Is the suspect leaving? Do the police have a way? If the suspect's leaving, and they're talking to the neighbor and the suspect is driving off, would that be sufficient for a stop? It could be. Again, hypotheticals are tough because you don't have all the facts you have in this case, but it could be Well, they need to investigate He needs to know who it is Based on, if this is the rule, then I don't know why they couldn't stop somebody for investigating a dog barking One of the major factors here is the amount of time that has elapsed Judge Ronson's hypo is the same kind of scenario I could be at risk because my dog barks all the time As does mine As does mine Again, I think in this set of facts Judge Windmill was correct that this suspect was leaving They had no certain method for identifying who he was How could we write this opinion to avoid Judge Ronson's concern? You can look at the facts, and here you have the quality of information that you have pointing to the person as he's leaving, Mr. Harmel pointing to the person That's the guy, as he's leaving the scene The quality of information, which was absent in the Jogetti case which Mr. Monahan talks about The fact that it's a recently completed crime, and the fact that the suspect is leaving the area, and that the police have no certain method for obtaining his identity Gives this court the ability not to authorize car blanche, traffic stops two weeks down the road, three months down the road Yes Your Honor, I see I'm out of time I would just ask that the court affirm the district court's rulings in this case Thank you Thank you Mr. Monahan, I think you get to make your rebuttal argument Thank you, Your Honor Just to quickly respond on the motion to suppress My position is that if the police can always pull over as a matter of convenience Then the other factors that Justice O'Connor and the majority in Hensley talk about mean nothing And obviously the court, I think, wanted them to mean something The police also, I would say This wasn't a case where they had no idea who this gentleman was There were alternatives, the house down the street Calling dispatch, calling in the license plate They had ways to learn who this gentleman was Because Mr. Grigg had already been given a verbal warning by the police At some time in the past I do wish to object to the government's claim that I'm the one who brought him into the equation With respect to the offer of immunity If the court looks at my brief, the reply brief at page 23 There's the full exchange between myself and Agent Kohler I didn't just say right off the bat Hey, he, the prosecutor, wanted to authorize the use of immunity I first asked Mr. Kohler Did either you or Agent Reby offer Mr. Poppa immunity? No, sir, we did not make any promises I think his representation was regarding the defense witness Mr. Poppa was where you introduced the prosecutor I thought that's what he said I'm not certain that that's correct And then I asked Mr. Kohler again At any time? Response. It's possible I can't remember, I can't recall We could have due to the fact that we went out there To find out the situation with the firearm That's possible, yes Two questions where I didn't get the answer I needed So now I need to jog his memory Alright, did you tell him the prosecutor had offered him immunity? Yes, I believe so, I do not recall But you believe so? I'm thinking yes With respect to the objection, I did get cut off To say that the objection improper argument didn't encompass The Nazi remark is, I think, unfair I would also say that compared to the other cases Such as Combs, Weatherspoon, Kerr I made far more objections than were made in those cases And those cases were reversed, in my view, for plain error That didn't come to this standard Do you agree that plain error is the proper standard of review? I do not, Your Honor. I think that I made a vouching objection I made an improper argument objection I made a facts not in evidence objection And I made an attack on defense counsel objection I think that all those taken together met the harmless error standard I see that my time is up, I want to thank the court for this opportunity Thank you We thank you both, and we hope that you Whatever the result in this case, that you do go fishing together The court will take a 15 minute recess
judges: Gould, Paez, Rawlinson